1

2

3   Dona A. Nutini, Esq. – 018539
4   **Law Office of Dona A. Nutini, P.C.**
    3411 N. 32nd Street
5   Phoenix, AZ 85018
    602.667.0060
6   Fax: 602.257-4453
    nutinilaw@aol.com
7
    Attorneys for Plaintiff.
8
                    **UNITED STATES DISTRICT COURT**
9
                         **DISTRICT OF ARIZONA**
10

11  | PAUL ALAN RHEUDASIL, an individual, | No. |
    |---|---|
12  | Plaintiff, | |
13  | vs. | **COMPLAINT** |
14  | AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, a labor organization; | **(Breach of Duty of Fair Representation; Breach of Fiduciary Duty; Breach of Contract; Breach of Duty of Good Faith and Fair Dealing; Tortious Interference with Contract; Defamation)** |
15  | ALPA MASTER EXECUTIVE COUNCIL (AMERICA WEST AIRLINES), a labor organization; ALPA LOCAL EXECUTIVE | |
16  | COUNCIL 62 (PHX), a labor organization; JAMES R. BAKER, an individual; JOHN | |
17  | H. MCILVENNA, an individual; CHESTER J. SZMAL, an individual; | |
18  | MITCHELL A. VASIN, an individual; RICHARD A. PITT, an individual; | (Jury Trial Requested) |
19  | WILLIAM A. WILSON, an individual; WILLIAM RAYMOND BURKETT, an | |
20  | individual, | |
21  | Defendants. | |

22

23

24          For his Complaint, Plaintiff Paul Alan Rheudasil ("Rheudasil" or "Plaintiff")

25  alleges as follows:

26          1.      Rheudasil is a resident of Gilbert, Maricopa County, Arizona.

27          2.      Defendant Air Line Pilots Association, International (herein "ALPA") is a

28  labor organization as defined by the Railway Labor Act, 45 U.S.C. §151.

3.      Defendant ALPA Master Executive Council (America West Airlines) ("MEC" or collectively with ALPA or the LEC below "union") is a division of ALPA that is responsible for negotiating and administering the collective bargaining agreement between ALPA and America West Airlines.

4.      Defendant ALPA Local Executive Council 62 (PHX) ("LEC") is the local arm of ALPA MEC charged with representation of pilots employed by America West Airlines domiciled in Phoenix, Arizona.

5.      Defendant James R. Baker was Chairman of the MEC from approximately August 2005 to August 2006.

6.      Defendant John. H. McIlvenna was Vice Chairman from approximately 2004 to December 2006, and Chairman of the MEC from December 2006 to the present.

7.      Defendant Chester J. Szmal was MEC Chairman during approximately 2004 and the first half of 2005, and was elected Vice Chairman of the LEC in March 2006, and has held that position since that time.

8.      Defendant Mitchell A. Vasin was MEC Grievance Committee Chairman from March 2005 until December 2006, and is currently MEC Vice Chairman.

9.      Defendant Rick Pitt is currently Chairman of the LEC and has also been a Captain Representative since approximately March 2006.

10.     Defendant William A. Wilson has been the Vice Chairman of the MEC Training Committee at all material times.

11.     Defendant William Raymond Burkett is currently a First Officer Representative for ALPA Local Executive Council 82 (LAS), and has held that position since approximately October 2005.

12.     All the material acts and conduct described herein occurred in Maricopa County, Arizona, and jurisdiction is proper with this Court under 28 U.S.C. §1331.

**General Allegations**

13.     Plaintiff is an airline pilot and has been employed by America West Airlines and its successor, US Airways (collectively "the Airline"), for over 20 years.

14.     At all material times, Plaintiff has been a member in good standing of ALPA

15.     At all material times, ALPA has represented the pilots at the Airline, with a collective bargaining agreement in effect at all material times.

16.     On or about December 10, 2003, Plaintiff was appointed Director of Flight Technical and Training for the Airline.  This was an executive position recognized by the ALPA-Airline collective bargaining agreement.  Plaintiff, however, remained a member of ALPA, continued to pay dues to ALPA, and was entitled to the benefit of representation.

17.     At the time of his appointment as Director of Flight Technical and Training, and for 10 years prior, Plaintiff had been an Airbus Captain and also had Check Airman status.  Plaintiff's executive position and Check Airman status provided him with additional compensation above and beyond his pilot pay.

18.     In January 2004, ALPA LEC published an official communication known as a "Fastread" to the pilots of America West declaring Plaintiff incompetent. This communication requested that pilots demand that the CEO of the Airline and the Airline's board of directors remove Plaintiff from his position as Director of Flight Technical and Training.  This action by LEC leadership was intentionally injurious to Plaintiff's reputation.

19.     During his first year as Director of Flight Technical and Training, Plaintiff's superior asked him to undergo training for the B757 airplane because his responsibilities as Director of Flight Technical and Training required him to have oversight for the technical flight operations of that equipment, as well as others.

20.     As a result of these instructions, and because the Airline anticipated LEC opposition if Plaintiff used the prior past practice of self–assignment for training, in August 2004, Plaintiff bid for B757 training under bid number 2004-09.  However, Plaintiff did not displace or otherwise occupy a slot that could have been held by another pilot.

21.    In May 2005, America West Airlines announced its intent to merge with US Airways.

22.    Although Plaintiff had been awarded the B757, he never underwent training pursuant to that award, and therefore maintained his Airbus Captain and Check Airman qualifications.

23.    US Airways Vice President of Flight Operations, Ed Bular, informed America West Airlines Vice President of Flight Operations, Joe Chronic, that the MEC Chairman Defendant James R Baker's negative attitude toward Plaintiff presented difficulties in his decision to retain Plaintiff as Director of Flight Technical and Training once the merger was completed.

24.    In November 2005, after the America West merger with US Airways was completed, Plaintiff was informed that he would be replaced as Director of Flight Technical and Training.

25.    Section 24-G of the contract between ALPA and the Airline provided that a pilot who held an award but had never received training pursuant to that award could bid and be awarded another position on a subsequent bid.

26.    Because Plaintiff had never received training on the B757 pursuant to Bid 2004-09, in November 2005, he submitted a bid under Bid Number 2005-02 for PHX AIRBUS CAPTAIN, a position for which he was qualified and for which he was awarded the position.

27.    Plaintiff's award under Bid 2005-02 had no effect on pilot staffing, or on the position of any other pilot.

28.    Despite the fact that Plaintiff's Airbus award did not affect any other pilot, and was in accordance with the contract, then-MEC Vice Chairman Defendant John McIlvenna protested Plaintiff's return to the Airbus, and as a result, Plaintiff was removed from the Airbus award.

29.     Although Plaintiff had still not received training on the B757, the MEC's actions resulted in him being "locked" on the B757, preventing Plaintiff from bidding for any other equipment for four years.

30.     Because he was now considered "locked" on the B757, once Plaintiff was trained on the B757, Plaintiff would no longer receive the additional compensation provided to pilots with Check Airman status.

31.     Thereafter, on December 10, 2005, Plaintiff submitted a formal protest in accordance with published bid protest guidelines.

32.     Despite having received Plaintiff's protest, the MEC never responded.

33.     By letter dated May 8, 2006, then-Vice President of Flight Operations Joe Chronic relieved Plaintiff from the B757 bid, believing he had authority to do so under the contractual management rights provision.

34.     On June 1, 2006, Plaintiff was replaced as Director of Flight Technical and Training and returned to the line as an Airbus Captain/Check Airman.  As a result, Plaintiff experienced a significant reduction in compensation.

35.     On June 1, 2006, the MEC, through its Chairman Defendant Baker, filed a grievance (2006-068) challenging Plaintiff's return to the Airbus.  Although the grievance was ostensibly based on "contractual compliance," no provision of the contract was cited as having been violated by Plaintiff's return to the Airbus.  In this MEC grievance, Plaintiff was specifically named in the requested remedy, which sought to force him onto the B757 without his Check Airman status or pay.

36.     The MEC did not inform Plaintiff that this grievance had been filed. Plaintiff learned of the grievance through a conversation with Defendant Rick Pitt, who was a local union official.  Defendant Pitt agreed with Plaintiff that although the grievance was filed under the "cloak" of contractual compliance, it was really filed because certain members of the LEC intended specifically to damage Plaintiff.

37.     Plaintiff believes that certain members of the MEC and LEC, including Defendants Szmal and Baker, wish to damage him in part because he threatened LEC

leadership with legal action for libel and defamation in regards to the 2004 Fastread publication.

38.    On July 28, 2006, Plaintiff filed a grievance (2006-87) to challenge his removal from the Airbus award.

39.    In September 2006, after the first level hearing on Grievance 2006-87, the Airline and the MEC and LEC agreed that Plaintiff's interpretation of the "lock-on" policy was correct (meaning he should not be locked onto the B757 and therefore should be recognized as Airbus Captain as awarded in Bid 2005-02), and drafted a letter of understanding memorializing their agreement.

40.    The letter of understanding ("LOU") clarified the language in the contract that if a pilot has never been trained on a particular aircraft, he or she could not be locked on that aircraft.  Therefore the letter of understanding was beneficial to all pilots.

41.    On September 14, 2006, the MEC and LEC pulled their support for the LOU.  This action was detrimental to the entire membership.

42.    Defendant Rick Pitt told Plaintiff that Defendant Szmal was adamantly opposed to the LOU because it was helpful to Plaintiff.

43.    On October 12, 2006, Plaintiff learned from Defendant Vasin that the MEC had filed another grievance, this time challenging the Airline's failure to include Plaintiff in the October 2, 2006 B757 training class.

44.    Plaintiff explained to Defendant Vasin that he had been granted a training bypass in July 2006 while his grievance (2006-87) was pending, and thus was properly withheld from training.

45.    It had long been a past practice of the Airline for the Chief Pilot to grant training bypasses when deemed appropriate.

46.    Training bypasses have long been supported by the MEC and LEC and recognized by the MEC to be extra-contractual, and considered beneficial to all pilots.

47.    At no time in the history of the MEC or LEC had it ever filed a grievance to force a pilot on bypass to attend training.

48.    Subsequently, as a result of the MEC's opposition to Plaintiff's training bypass, training bypasses were prohibited for all pilots.

49.    The MEC's opposition to Plaintiff's training bypass, and its agreement to prohibit all training bypasses, was detrimental not only to Plaintiff, but to all pilots.

50.    On October 20, 2006, in light of the MEC's and LEC's opposition to Plaintiff's position, the Airline denied Plaintiff's grievance.  He decided to appeal that decision to the next level.

51.    Section 24-Q of the collective bargaining agreement provides that "the Vice president of Flight Operations and the ALPA MEC Chairman will consider each request for a change of Position due to hardship on a case-by-case basis, giving due consideration to the particular circumstances involved."

52.    On November 27, 2006, Plaintiff submitted confidential medical and family information to Vice President of Flight Operations Ed Bular and MEC Chairman Kevin Kent as part of his request for change of position due to hardship under contract Section 24-Q.

53.    Kent later told Plaintiff that he had taken Plaintiff's request to ALPA legal and ALPA grievance committee, and that Kent had been advised that Plaintiff's request was within the intent of the contract.

54.    On November 28, 2006, Plaintiff was advised by both Bular (through Chief Pilot Dan Rogers) and Kent that an agreement had been reached granting Plaintiff a change of position back to Airbus due to hardship.

55.    As a result of this agreement, the Airline cancelled Plaintiff's B757 training.

56.    On November 29, 2006, despite the agreement having been reached granting Plaintiff the change of position due to hardship, Kent called Plaintiff and told him that now the MEC wanted to see some documentation supporting the hardship claim.

57.    On or about November 29, 2006, Defendant William A. Wilson, Vice Chairman of the MEC Training Committee, engaged in discussions with the MEC and LEC and other committee members regarding Plaintiff's request for change of position due to hardship.  This constituted a breach of confidentiality by the MEC concerning Plaintiff's request.

58.    Defendant Wilson subsequently published a defamatory post directed to all pilots on the ALPA WebBoard, which was intended to discredit Plaintiff and to influence against the grant of Plaintiff's request.

59.    Thereafter, on November 30, 2006, Plaintiff was required to appear before a panel consisting of both LEC 62 and LEC 82 leadership, as well as other union officials and committee members (a total of approximately 12 individuals) to submit to questioning as to the basis for his hardship request.

60.    Even before he could finish his explanation, Plaintiff was told to stop, and to answer various questions from the Council members.

61.    The first question for Plaintiff, asked by Defendant Raymond Burkett, and other questions asked by members of the panel, indicated clearly that Plaintiff's confidential information had been improperly disseminated among the Council members.

62.    Plaintiff was asked to step outside the room while the Council deliberated his hardship request.  Plaintiff could hear the Council members discussing the reasons they would give Plaintiff for denying his hardship request.

63.    On December 1, 2006, Kent called Plaintiff and told him that although he (Kent) supported Plaintiff's request for hardship change of position, the MEC had overruled his decision and denied the change of position.

64.    On December 4, 2006, Kent was removed by the Council as MEC Chairman.

65.    Despite the MEC's agreement to prohibit all training bypasses, it devised an exception for pilots on union business to be granted training bypasses.

66.    In response to the MEC's actions and its requested remedy in their grievance challenging Plaintiff's training bypass (2006-200), the Airline was forced to create a B757 training class of one pilot.  Plaintiff reported to class on January 2, 2007. Plaintiff's Check Airman status and the associated additional compensation was now removed.

67.    Plaintiff filed a grievance challenging the denial of his change of position due to hardship, even though it was the MEC, not the Airline, that denied his request.

68.    After the MEC argued against Plaintiff's grievance at every level, the grievance was scheduled for arbitration, to take place in Washington D.C. in June 2007.

69.    In June 2007, shortly before the scheduled arbitration hearing, ALPA's Chairman of the System Board of Adjustment, Tom Nehez, informed Plaintiff that none of the union witnesses at the arbitration hearing would support Plaintiff's position and that this would be the first arbitration he had chaired where the union's position was in opposition to the grievant.

70.    In addition, during this same period ALPA's contract administrator, Andrew Shostack, advised Plaintiff to expect other testimony against Plaintiff's position to be given at the arbitration.

71.    At that point, given the total lack of support from the LEC, MEC and ALPA, Plaintiff withdrew his grievances.

72.    Plaintiff was later informed by the Airline's manager of labor relations that the Airline was in favor of granting Plaintiff's change of position due to hardship and that it was the union that had stood in the way.

## **Count One**

(Breach of Duty of Fair Representation – Violation of Railway Labor Act

45 U.S.C. § 151 *et seq.*)

73.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

74.    Under the duty of fair representation, Defendants have an obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with good faith and honesty, and to avoid arbitrary conduct.

75.    Defendants also have an obligation under the duty of fair representation, to act in a rational, nonarbitrary fashion to provide their members fair and adequate representation.

76.    By denying Plaintiff his requested change of position due to hardship, when the Airline was willing to grant Plaintiff's request, Defendants acted arbitrarily, in bad faith, with hostility and discrimination, and against the interests of their membership.

77.    By filing grievances requesting remedies that specifically damaged Plaintiff as well as the general membership, and by withdrawing support for the LOU on lock-ons, and by challenging the training bypass granted to Plaintiff, Defendants acted arbitrarily, in bad faith, with hostility and discrimination, and against the interests of their membership.

78.    Defendants' conduct unlawfully breached the duty of fair representation.

79.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has lost his position of Airbus Captain and Check Airman.

80.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages in an amount in excess of $750,000 to be proven at trial.

81.    Plaintiff is also entitled to his attorneys' fees.

## Count Two

### (Breach of Fiduciary Duty)

82.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

83.    All unions owe a fiduciary duty to their members.

84.    This fiduciary duty requires unions to represent their members with the strictest loyalty and to act in good faith.

85.    By actively taking positions against Plaintiff's interests as well as the interest of their general membership, Defendants breached their fiduciary duty to Plaintiff.

86.    By disseminating the confidential basis for Plaintiff's request for change of position due to hardship to numerous members of the MEC, LEC and even to others, Defendants breached their fiduciary duty to Plaintiff.

87.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff has been damaged in amount in excess of $750,000 to be proven at trial

88.    Plaintiff is also entitled to his attorneys' fees.

## **Count Three**

### (Breach of Contract – Third Party Beneficiary)

89.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

90.    The agreement between Vice President of Flight Operations Ed Bular and MEC Chairman Kevin Kent granting Plaintiff a change of position due to hardship constituted a contract with Plaintiff as the recognized and intended third-party beneficiary.

91.    When the Defendant MEC and Defendants McIlvenna, Szmal, Vasin, Pitt, Wilson and Burkett overrode Kent's decision to grant the change of position due to hardship, the MEC breached that contract.

92.    As a direct and proximate result of Defendants' breach of contract, Plaintiff has been damaged in an amount in excess of $750,000 to be proven at trial.

93.    Plaintiff is also entitled to his attorneys' fees under A.R.S. §12-341.01.

## **Count Four**

### (Breach of Covenant of Good Faith and Fair Dealing)

94.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

95.     The duty of good faith and fair dealing is implied in every contract.

96.     By their acts and omissions described above regarding the agreement to grant Plaintiff a change of position due to hardship, Defendants acted in a manner that impaired Plaintiff's right to receive the benefits that agreement, breaching the implied covenant of good faith and fair dealing.

97.     As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in an amount in excess of $750,000 to be determined at trial.

98.     Plaintiff is also entitled to his attorneys' fees and to punitive damages resulting from Defendants' willful and intentional conduct.

## Count Five

(Tortious Interference with Contract—Director Position)

99.     Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

100.    Plaintiff had an implied agreement with the Airline for employment as Director of Flight Technical and Training.

101.    Defendants were aware of that implied agreement.

102.    Defendant Baker intentionally interfered with the agreement, causing the Airline to replace Plaintiff as Director of Flight Technical and Training.

103.    Defendant Baker's conduct was improper.

104.    As a direct and proximate result of Defendant Baker's improper conduct, Plaintiff has suffered damages in an amount in excess of $3,400,000 to be determined at trial.

105.    Plaintiff is entitled to punitive damages and attorneys' fees as a result of Defendant Baker's willful and intentional conduct.

. . .

. . .

. . .

**Count Six**

(Tortious Interference with Contract—Hardship)

106.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

107.    Plaintiff was the third-party beneficiary of the agreement between Vice President of Flight Operations Ed Bular and MEC Chairman Kevin Kent granting him a change of position due to hardship.

108.    Defendants were aware of that agreement.

109.    Defendants intentionally interfered with the agreement, causing the denial of Plaintiff's request for change of position due to hardship.

110.    Defendants conduct was improper.

111.    As a direct and proximate result of Defendants' improper conduct, Plaintiff has suffered damages in an amount in excess of $750,000 to be determined at trial.

112.    Plaintiff is entitled to punitive damages and attorneys' fees as a result of Defendants' willful and intentional conduct.

**Count Seven**

(Defamation)

113.    Plaintiff incorporates by reference all previous paragraphs as if stated in full herein.

114.    The statements made by Defendant William A. Wilson on the WebBoard on or about November 29, 2006 were false.

115.    These statements made by Defendant Wilson were reckless, and Defendant Wilson knew or should have known that these statements could and/or would have a detrimental impact on the business and/or reputation of Plaintiff.

116.    The statements made by Defendant Wilson constitute *per se* defamation.

117.    As a result of the statements made by Defendant Wilson, Plaintiff has been

1    harmed.

2        118.    The statements made by Defendant Wilson were made during the course

3    and scope of his union responsibilities.

4        119.    As a result of the disparaging statements made by Defendant Wilson,

5    Defendant Wilson and Defendants ALPA, Defendant MEC and Defendant LEC are

6    responsible and liable for, pursuant to the doctrine of *respondeat superior*, and Plaintiff is

7    entitled to, damages, including punitive damages.

8

9

10        **WHEREFORE**, having fully stated its claims against Defendants, Plaintiff

11    requests a judgment as follows:

12            a.    For a jury trial in this matter;

13            b.    For compensatory damages in an amount, in excess of $3,400,000

14                 to be proven at trial;

15            c.    For punitive damages;

16            d.    For all attorneys' fees under law, rule or regulation;

17            e.    For all costs of suit, costs of collection, and maximum interest

18    available to Plaintiff under any law, rule or regulation;

19            f.    For such other and further relief as the Court deems just and proper.

20        DATED this 24th day of August, 2007.

21                                **Law Office of Dona A. Nutini, P.C.**

22

23

24        By  /s/ Dona A. Nutini
                Dona A. Nutini, Esq.
25              3411 N. 32nd Street
                Phoenix, AZ 85018
26
                Counsel for Plaintiff
27

28